UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| MICHAEL BREEDEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 3:08-CV-322 |
| ) | (VARLAN/GUYTON) |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b), Rule 72(b) of the Federal Rules of Civil Procedure, and the Rules of this Court for a report and recommendation regarding the disposition by the District Court of the plaintiff's Motion For Judgment On The Pleadings [Doc. 11], and the defendant's Motion For Summary Judgment. [Doc. 15]. Plaintiff Michael Breeden seeks judicial review of the decision of the Administrative Law Judge ("ALJ"), the final decision of the defendant Commissioner.

**BACKGROUND**

Plaintiff was 40 years of age when the ALJ issued his decision (Tr. 23, 108). He attended school through the tenth grade, and he has work experience as a sales representative (Tr. 135, 130). He alleges that he has been disabled by back and leg pain/numbness since August 1, 2002 (amended to June 10, 2002 (Tr. 115)), after sustaining an on the job back injury (Tr. 108, 129).

## MEDICAL RECORD EVIDENCE

The relevant medical record evidence is summarized as follows:

Plaintiff complained of low back pain, and he underwent lumbar discography in April 2001 (Tr. 392, 394). In October 2001, and in January 2002, plaintiff reported to a nurse practitioner that he was doing well, with tolerable pain, and he was able to do the activities which he enjoys (Tr. 371, 377). In November 2001, plaintiff had reported increased pain due to "a lot more activity" and deer hunting (Tr. 375). In March, April, and May 2002, plaintiff reported doing better and being pleased with his medication regimen (Tr. 360-64). Plaintiff was working more hours at Knoxville Seed because this was the busy time of year (Tr. 358, 360). He reported increasing pain in June 2002 and underwent an epidural injection (Tr. 350, 356).

On July 10, 2002, plaintiff became a new patient of Oak Ridge Neurological Associates, complaining of low back and left leg pain (Tr. 235). On July 10, 2002, plaintiff underwent micro lumbar discectomy on the left at L5-S1 with forminotomy after an MRI and CT scan revealed protruding discs that compressed the nerve root (Tr. 207-08, 213-14, 230-33, 236–40, 286-87 292-93, 355). Later that month, he had surgery to repair a ruptured disc at L4-5 (Tr. 205-06, 210). Plaintiff continued to take prescription pain medications.

In August 2002, plaintiff had a follow-up visit with his surgeon. Plaintiff ambulated independently (Tr. 283). The doctor recommended a continued walking program and pain management (Tr. 283). A lumbar spine MRI showed mild disc protrusion at L4-L5, and no disc herniation, stenosis, or foraminal narrowing at other levels (Tr. 266).

2

In November 2002, a lumbar spine myelogram revealed "no evidence of recurrent disc herniation." Plaintiff met with his doctor and reported severe pain in his back and legs. The doctor's impression was "chronic pain disorder. Possibly rebound pain due to withdrawal symptoms." The doctor recommended an increase in the plaintiff's pain medications (Tr. 262, 272).

In May 2003, pool therapy was recommended by plaintiff's doctor, though plaintiff reported improvement in his low back pain (Tr. 244-45). In July 2003, however, plaintiff reported to a physical therapy office that he had constant pain in his feet and back pain at "8/10." He also reported that he was "currently driving and not working," he did not have to climb stairs, and he walked 1 mile, 3 times a week (Tr. 299). Though he attended an initial physical therapy visit in July 2003, and one aquatic therapy session, he did not show up for any further scheduled therapy sessions, and he was discharged on August 21, 2003 (Tr. 294-97).

An October 2003 MRI showed degenerative changes and canal and foraminal stenosis at L4-5 (Tr. 319). Dr. Lucas noted that Dr. Vargas examined plaintiff's MRI and "did not feel that there was any evidence of recurrent or new disk herniations or significant . . . stenosis" (Tr. 317, 476-77). To Dr. Vargas, plaintiff claimed any and all activity aggravated his pain. Physical examination revealed 5/5 strength and 2+ reflexes, sensory deficits, and mild to moderate muscle spasms (Tr. 473-75, 482-84). A dorsal lumbar stimulator was recommended; plaintiff denied any medication side effects (Tr. 317). In November 2003, plaintiff underwent a "conservative" decompressive neuroplasty to remove scar tissue (Tr. 314, 316). That month he reported that he went to Alabama with a church group, and he went hunting (Tr. 313).

3

In November 2003, consulting physician Dr. Jeffrey Summers examined the plaintiff (Tr. 301). Plaintiff reported that bending at the waist, stooping, kneeling, squatting, climbing, and lifting "greater than 20 lbs." worsened his back pain (Tr. 301). He also claimed he could not sit, stand or walk for more than 30 continuous minutes without pain (Tr. 301). Physical examination revealed 5/5 strength in all major muscle groups, normal muscle tone and bulk, 1+ reflexes, and preserved sensation, with reduced spinal range of motion (Tr. 302-03). Gait was normal and plaintiff did not use a cane. Dr. Summers opined that plaintiff's reported limitations were reasonable but that the plaintiff "should tolerate all other work-related activities in this regard" (Tr. 303).

In January 2004, Dr. Richard, a state agency physician, reviewed the medical evidence and concluded plaintiff could lift 50 pounds occasionally and 25 pounds frequently, and sit, stand, and walk for 6 hours, and could occasionally balance, kneel, crouch and crawl (Tr. 305, 307).

In May 2004, Dr. George Bounds, also a state agency physician, reviewed the evidence and concluded that plaintiff could lift 50 pounds occasionally and 25 pounds frequently, sit, stand, and walk for six hours each, and occasionally climb ladders, ropes, and scaffolds, stoop, and crawl (Tr. 404-409).

From September 2004 through June 2007, plaintiff continued to be seen for medication refills at St. Marry's Medical Center (Tr. 413-63, 487-500, 504-25). In September 2004, he began seeing pain management specialist Dr. Christopher Vinsant (Tr. 460). Plaintiff reported that his back pain had progressively worsened over the past 6 to 12 months, and was caused by activity (Tr. 460). Physical examination showed a steady gait, reduced spinal range of motion, 5/5

strength in his arms and legs, and 2+ reflexes (Tr. 460). On November 5, 2004, plaintiff reported that "Actiq works absolutely great for break thru" pain and the "routine he is on now is working great" (Tr. 443). On December 31, 2004, plaintiff reported that he was "doing much better this month" and had "good" activity levels (Tr. 432). In January 2005, he reported that his activity level improved, and was doing well on medication, though Hydrocodone did not control breakthrough pain (Tr. 427).

On November 10, 2004, plaintiff returned to Dr. Eugenio Vargas; he had not seen plaintiff since October 2003 (Tr. 471). During examination, plaintiff exhibited a "significant amount of pain behavior, with constant sighing and constant huffing, and difficulty moving in any and all directions," but Dr. Vargas observed that "through direct testing there was no spine and muscle spasm whatsoever" (Tr. 471). Plaintiff had 5/5 strength, reduced sensation on the left calf, and normal reflexes (Tr. 471). Dr. Vargas compared a November 9, 2004 MRI to one done in October 2002, and found "no appreciable changes," with only mild degenerative changes (Tr. 417). Dr. Vargas did not "see any abnormalities on his examination or his radiographic study" that required surgery. He concluded "Treatment is to be as per the pain specialist" (Tr. 472).

In April 2005, plaintiff had a spinal cord stimulator inplanted, but he was unable to tolerate any spinal cord stimulation and it was removed (Tr. 469).

Notes from St. Mary's Health System document that plaintiff continued to be prescribed pain medication from August 2005 through May 2007, with virtually no changes made to his medication regimen (Tr. 504-25). In October 2005, plaintiff reported that he was "active" and

5

he was "going to [Louisiana] with church" (Tr. 524). In December 2005, he was "volunteering at church [with] food pantry" (Tr. 523). In March 2006, plaintiff reported that he was able to do his self-care, and he was excited about his involvement with the "youth ministry at church" (Tr. 521-22). His activity level was "low to moderate." Regarding medication control of pain, plaintiff reported he "is doing fine during the day" (Tr. 521). In April 2006, plaintiff "stays with his father who has been ill sometimes" and he was "getting ready to go on vacation with his family to Myrtle Beach" (Tr. 520). His sleep was better (Tr. 520). In May 2006, plaintiff reported that he watched his daughter's softball games and he was active with youth at church (Tr. 519). In June and July 2006, plaintiff reported that he enjoyed youth group trips and music at church (Tr. 518). In August 2006, his sleep, activity levels and appetite were "good" (Tr. 514, 516). In September 2006, plaintiff asked for 2 months of prescription medication because he was "going to New Orleans to help his brother who has been contracted out with their dump trucks to help remove debris" (Tr. 512). In December 2006, and January 2007, plaintiff reported he was able to perform self-care and enjoyed hunting "when he can" (Tr. 508, 510).

In March 2007, plaintiff reported that he "does part time work with a friend's business with sales. He states he does minimal due to the fact that he doesn't want to lose his disability" (Tr. 506).

On May 22, 2007, after he found out he would be losing his disability, plaintiff reported that he was "very active with church activities," but stated he could no longer "help his friend do any kind of sales" (Tr. 504).

6

## TESTIMONY EVIDENCE

At the hearing before the ALJ on July 21, 2005, the plaintiff testified that he was unable to "run the laundry" or "cook the meals" (Tr. 547).[1] He rated his back pain as 10/10, but then stated that medication reduced that to "about an eight" (Tr. 549). He said he could only stand, sit, or walk for 5 to 10 minutes at a time (Tr. 549), and he could lift 15-20 pounds comfortably. He said he could bend over and touch his toes (Tr. 550).

At the second hearing before the ALJ on August 30, 2005, Dr. Arthur Lorber, a medical expert, testified that based on the medical evidence of record, he would limit plaintiff to a range of sedentary work with sit/stand option for 30 minutes at one time for a total of six hours per day (Tr. 566). Dr. Lorber generally agreed with the assessment of Dr. Summers, but felt plaintiff should be limited to lifting 10 rather than 20 pounds (Tr. 567). He testified that a doctor's assessment of a "failed back syndrome" was "a meaningless syndrome - - I mean, a meaningless term. It doesn't specify any physiologic or anatomic abnormality" (Tr. 567). The medical expert noted that plaintiff was "neurologically intact" and he believed that plaintiff was "clearly addicted to narcotic prescription medication" (Tr. 568).

James Friedlob, a vocational expert, then testified that plaintiff's past relative work as a sales representative was light, skilled work (Tr. 570). The ALJ asked whether a person of plaintiff's age, education, and past relevant work experience, who was limited as Dr. Summers and Dr. Lorber indicated, could perform any work (Tr. 571). Friedlob testified that such a person could

---

[1] On another occasion, however, he reported that he did fix easy meals, like coffee and sandwiches, and that he did leave the house each day driving 5-15 miles (Tr. 124).

7

perform a number of jobs, which he identified. Assuming an ability to perform light work, Friedlob testified that even more jobs would be available (Tr. 573).

A third hearing was held in this case on October 31, 2007. The plaintiff testified that since his back surgery in 2002, he was not doing well and had not worked (Tr. 581). His back pain was controllable, but his leg pain was not (Tr. 582). He took pain medication and stated that he had memory problems, but otherwise had no side effects (Tr. 582, 587). Plaintiff said he needed to lie down during the day; sitting was a problem (Tr. 583). He testified that he would lay down "most of the day;" he was up for 30 minutes to 1 hour to go to the convenience store, and then back home (Tr. 583-84). Plaintiff testified that he "can't do anything" (Tr. 585). He testified that he was unable to golf, hunt, or participate in his church group since at least October 2005 (Tr. 585). He testified that he "helped out a lot [at his church] about two years ago, and my pain has just worsened, and he claimed "I don't even get to go to church anymore" because he could not sit more than "10, 15 minutes at a time" (Tr. 586-87). Plaintiff testified he could stand for 5 or 10 minutes (Tr. 587). He could lift 1 gallon of milk (Tr. 588).

James Flynn, a vocational expert, then testified that plaintiff had past relevant work as a salesperson, which was light, semiskilled work, and delivery truck driver, which was heavy, semiskilled work (Tr. 593). The ALJ asked Flynn to assume an individual of plaintiff's age, education, and past relevant work experience, who could perform light work, but could only occasionally climb, balance, stoop, kneel, crouch, or crawl, and needed to avoid hazards and vibration (Tr. 593). Flynn testified that such a person could perform plaintiff's past relevant work (Tr. 594). In the alternative, if the person could perform only simple, routine, sedentary work, there

8

would still be jobs, some of which he identified (Tr. 594). However, if the person suffers from severe pain on a daily or almost daily basis, that would cause loss of concentration and would completely eliminate work, according to Flynn (Tr. 594).

## **DECISION OF THE ALJ**

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since August 1, 2002, the alleged onset date.

3. The claimant has the following severe impairment: chronic back pain status post laminectomy and fushion.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work except with occasional climbing, balancing, stooping, bending, crouching, crawling, avoidance of heights and vibrations.

6. The claimant is able to perform past relevant work in sales, according to vocational expert testimony.

9

7. The claimant was born on November 7, 1967, and was 34 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.

8. The claimant has a limited education and is able to communicate in English.

9. The claimant has acquired work skills from past relevant work.

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that is transferable to other occupations with jobs existing in significant numbers in the national economy.

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2002 through the date of this decision.

(Tr. 15-23).

The Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 6-11). Therefore, the ALJ's decision stands as the Commissioner's final decision subject to judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## STANDARD OF REVIEW

If the ALJ's findings are supported by substantial evidence based upon the record as a whole, they are conclusive and must be affirmed. Warner v. Commissioner of Social Security, 375 F.3d 387 (6th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind

10

might accept as adequate to support a conclusion." Siterlet v. Secretary of Health and Human Services, 823 F.2d 918, 920 (6th Cir. 1987). It is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ or whether the reviewing judge may have decided the case differently. Crisp v. Secretary of Health and Human Services, 790 F.2d 450, 453 n.4 (6th Cir. 1986); and see Dorton v. Heckler, 789 F.2d 363, 367 (6th Cir. 1986) (holding that, in a close case, unless the Court is persuaded that the Secretary's findings are "legally insufficient," they should not be disturbed). The Court may not review the case de novo, resolve conflicts in evidence, or decide questions of credibility. Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

## **ANALYSIS**

Plaintiff argues that the ALJ erred in finding that he retained the residual functional capacity to perform a range of light work, because the ALJ did not follow the Appeals Council's April 2007 remand order to cite objective evidence supporting the residual functional capacity assessment. In addition, the plaintiff objects to the ALJ's finding that his statements concerning the intensity, persistence and limiting effects of his symptoms are not entirely credible [Doc. 12].

The Commissioner asserts that substantial evidence supports the ALJ's residual functional capacity finding for light work. The Commissioner argues that this finding was consistent with the opinions rendered by Dr. Summers, a consulting physician and the vocational expert [Doc. 16].

11

The Court agrees with the Commissioner that even if the plaintiff could perform only a reduced range of sedentary work, as he reported to Dr. Summers in November 2003 (Tr. 301), the record contains the vocational expert testimony that identifies thousands of jobs existed for a person with plaintiff's age, education and vocational profile (Tr. 573). At plaintiff's 2007 hearing, the vocational expert testified that, assuming the ALJ's RFC finding of a range of light work, plaintiff could perform his past relevant sales work. Even if he were limited to the performance of only simple, routine, sedentary work, there would still be thousands of jobs he could perform (Tr. 594). The opinions of Dr. Lorber, Dr. Richards, and Dr. Bounds support this conclusion. This testimony provided substantial evidence supporting the ALJ's finding that plaintiff was not disabled because he could perform a significant number of jobs.

Plaintiff argues that the ALJ violated the Order of the Appeals Council, from April 2007. The Court, however, agrees with the Commissioner that the Appeals Council reviewed the ALJ's decision in this case, and found no basis for reviewing it (Tr. 6-8). The Appeals Council was satisfied that the ALJ complied with its 2007 Order of remand, and it affirmed the ALJ's decision.

Plaintiff also takes issue with the ALJ's credibility determination. However, the plaintiff's claims that he was unable to perform virtually any activity are refuted by his admissions to his physicians regarding his activities. In March 2004, he reported that cooking and housework were impossible for him (Tr. 160). In May 2007, he claimed that he had "difficulty standing to shower and to cook over a stove, difficulty wiping after using the bathroom" (Tr. 191). Yet, in November 2003, plaintiff reported that he went to Alabama with a church group and went hunting

(Tr. 313). In a May 22, 2007 note to his pain management provider, plaintiff reported that he was "very active with church activities" and was able to perform self care (Tr. 20-21, 504).

At his July 2005 hearing, plaintiff testified that he had not worked for money since 2002, and was physically unable to cook or do laundry. He also said that while he was once active in his church and enjoyed hunting, he "can't do nothing no more" (Tr. 545, 552). At his October 2007 hearing, plaintiff reiterated that the last time he worked was 2002 (Tr. 580). He claimed his pain was uncontrolled by medication, and attested that he need to lay down "most of the day" and claimed he "can't do anything" (Tr. 583-84). Plaintiff also said that the last time he was able to hunt or help out at church was 2 years ago, or in October 2005 (Tr. 585-86). The ALJ considered the claims and found them not fully credible (Tr. 20).

First, despite his claim that he had not worked at all for money since 2002, the ALJ noted plaintiff's report in March 2007, the he did "part time work with a friend's business with sales. He stated he does minimal due to the fact that he does not want to lose his disability" (Tr. 18, 506). Also regarding plaintiff's testimony in October 2007 that he did not hunt or help out at church for 2 years, the ALJ cited specific evidence that directly contradicted that claim (Tr. 18, 20-21). In October 2005, plaintiff reported that he was active and was "going to Louisiana with church" (Tr. 524). In December 2005, plaintiff reported that he was volunteering at a local food pantry with his church (Tr. 523). In March 2006, plaintiff reported he was excited about his involvement with the youth ministry at church and that pain medication controlled his pain such that he was fine during the day (Tr. 521-22). In April 2006, plaintiff reported moderate activity and indicated that he stayed with his father who had been ill, and plaintiff was getting ready to go on vacation to Myrtle Beach

13

(Tr. 18, 520). While the ALJ noted that taking vacations was not necessarily inconsistent with disability, it nonetheless suggested that plaintiff was not as limited as he claimed (Tr. 20). In May 2006, plaintiff reported that he watched softball games and was active with the youth at his church (Tr. 519). This evidence plainly contradicts plaintiff's testimony, both in 2005 and 2007, that he was no longer able to participate in church activities or even care for himself, since at least October 2005.

Regarding his purported inability to hunt since October 2005, plaintiff reported that he hunted when he could in 2003 (went to Alabama with church group and went hunting) (Tr. 313). He reported this again in December 2006 and January 2007 (Tr. 508, 510). Further, while plaintiff claimed he did not work since 2002, on at least two occasions, the record undermines that claim as well. In September 2006, plaintiff asked for 2 months worth of prescription medication because he was going to New Orleans to help his brother, who "has been contracted out with their dump truck to help remove debris" (Tr. 512). Finally, plaintiff reported in March 2007 that he "does part-time work with a friend's business with sales. He states he does minimal work due to the fact that he doesn't want to lose his disability" (Tr. 506).

In summary, although the plaintiff criticizes the ALJ's credibility assessment, his arguments are insufficient to overcome the significant deference owed an ALJ's credibility finding. See Cruse v. Commissioner of Social Security, 502 F.3d 532, 542 (6th Cir. 2007) ("[A]n ALJ's credibility determinations about the claimant are to be given great weight. . ."). Moreover, the ALJ's credibility determination is fully supported by the record.

14

The ALJ reasonably relied on the vocational expert's testimony to conclude that plaintiff could perform a significant number of jobs, despite the limitations caused by his impairments. Substantial evidence in the record as a whole supports the ALJ's decision that plaintiff was not disabled.

Accordingly, I find that the ALJ properly reviewed and weighed all of the medical source opinions, the objective medical findings, and plaintiff's credibility to determine that he could perform a range of light work. Substantial evidence supports the ALJ's findings and conclusions. Therefore, it is hereby **RECOMMENDED**[2] that the plaintiff's Motion For Judgment On The Pleadings [Doc. 11] be **DENIED** and that the Commissioner's Motion For Summary Judgment [Doc. 15] be **GRANTED**.

Respectfully submitted,

    s/ H. Bruce Guyton
United States Magistrate Judge

---

[2]Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general. Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370 (6th Cir. 1987).